UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------X
KYLE JIGGETTS,

               Plaintiff,

      - against -

LAGUARDIA AIRPORT, DEPT. OF
HOMELAND SECURITY, and TSA,

              Defendants.
--------------------------------------------------X

<u>MEMORANDUM & ORDER</u>
04-CV-3969 (NGG) (LB)

GARAUFIS, United States District Judge.

## I.    INTRODUCTION

Kyle Jiggetts ("Jiggetts" or "Plaintiff"), a *pro se* litigant, alleges that his former employers, LaGuardia Airport ("LGA"), the Department of Homeland Security ("DHS") and the Transportation Security Administration ("TSA") (hereinafter "Defendants"), unlawfully discriminated against him on the basis of his race (African-American) and religion (Islam) and retaliated against him for seeking Equal Employment Opportunity ("EEO") relief, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), codified at 42 U.S.C. §§ 2000e to 2000e-17. (Compl. at 2.) Jiggetts also claims that Defendants unlawfully discriminated against him on account of a physical disability (alcoholism) in violation of the Americans with Disabilities Act of 1990 ("ADA"), codified at 42 U.S.C. §§ 12112-12117. (<u>Id.</u> at 3.) Jiggetts further claims that Defendants subjected him to a hostile work environment, ostensibly based on his alleged disability of alcoholism. (<u>Id.</u> at 2.)

Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56, arguing that Jiggetts was terminated by TSA for failing to complete the required training necessary to be a Federal Security Screener ("Screener"), that he was dismissed from the required training program for being intoxicated during that training program, and that he declined Defendants' offer to permit him to return to training. (Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defs.' Mem. Supp. Summ. J.") at 2.) For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

## II.    FACTUAL BACKGROUND

When deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995). Even in a fact-intensive employment discrimination case, however, a court will not accept as fact mere allegations lacking evidentiary support. Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001).

The following facts are undisputed unless otherwise indicated. Jiggetts accepted a conditional appointment from TSA to be a Screener on August 29, 2002. (Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1 St.") ¶ 7.) He was assigned to LaGuardia Airport on September 8, 2002. (Id. ¶ 8.) Jiggetts' appointment at TSA, like all new appointments at TSA, was probationary for one year, pending successful completion of a security background investigation, a urinalysis test, and the required training. (Id. ¶ 7, Ex.

B.)  Jiggetts received notice about these conditions to his employment in his original appointment letter.  (Id.)

On September 16, 2002, Jiggetts began Basic Training, the first phase of required training to be a Screener, at the Marriott Marquis Hotel in Manhattan.  (Id. ¶ 9.)  Basic Training is a 45-hour program conducted over six days that includes classroom lectures, practical exercises, hands-on use of screening equipment, and computer based x-ray image interpretation labs.  (Id. ¶ 4, Ex. A.)  The purpose of this program is to make sure Screeners have the requisite technical skills and knowledge of TSA practices, as mandated by the Aviation and Transportation Security Act of 2001, Pub. Law No. 107-71, 115 Stat. 597.  (Id. ¶¶ 1, 4.)  Screener candidates must pass a three-part Screener Baseline Test ("SBT") in order to complete Basic Training.  (Id. ¶ 5.)  They begin on-the-job training ("OJT") at an airport only if they successfully pass the SBT.  (Id. ¶ 6.)

A.      Jiggetts' Training Experience

On his first day of Basic Training, Jiggetts signed an acknowledgment certifying that he received and reviewed the TSA's Code of Conduct, Standards of Performance, and Sensitive Security Information Restrictions ("Code of Conduct").  (Id. ¶ 10, Ex. E.)  The Code of Conduct provides, in relevant part, that "exhibition by students of substance abuse, intoxication or indications of recovery from intoxication by the use of alcohol or other drugs will not be tolerated."  (Id., Ex. E. at 3.)  It also requires that students attend all training classes.  (Id.)

On September 18, 2002, Ronald Olson ("Olson"), site coordinator for Basic Training, was informed by an instructor that Jiggetts was absent from his class for approximately one hour and forty-five minutes.  (Id. ¶ 11.)  When Jiggetts returned, he was glassy-eyed, had poor

coordination, and was eating breath mints.  (Id.)  Olson said that when Jiggetts visited his office

that same day, Jiggetts had a strong odor of alcohol about his person, was glassy-eyed and that

his manual dexterity was affected.  (Id. ¶ 12, Ex D.)

While in Olson's office that day, Jiggetts told Olson that he had consumed alcohol when

he left the classroom and that he was in counseling for depression, anxiety, and alcohol problems

related to the terrorist attacks of September 11, 2001.  (Id.)  Olson gave Jiggetts the option to

voluntarily resign, but Jiggetts refused.  (Id. ¶ 13.)  Olson then advised Jiggetts to go home and

return to Basic Training the next day.  (Id.; Jiggetts' Deposition Transcript ("Jiggetts' Dep. Tr.")

at 75-76.)  Jiggetts did not report to Basic Training the next day and acknowledges that he did

not complete Basic Training.  (Id. at 67.)  Jiggetts also acknowledges that he has no reason to

believe that he was sent home from Basic Training for any reason other than being intoxicated.

(Id. at 76.)

**B.     Jiggetts' Employment**

In the beginning of November 2002, Veda Mabray ("Mabray"), a human resources

specialist at LGA, contacted Jiggetts because she had prepared a check for him but lacked direct

deposit information.  (Defs.' 56.1 St. ¶ 15.)  Mabray claims that Jiggetts told her he had resigned

because he lost friends during the terrorist attacks of September 11, 2001.  (Id.)  However, when

Jiggetts came to Mabray's office on November 6, 2002 and was offered a check and an official

resignation form, he told Mabray he would not resign.  (Id. ¶ 15., Compl. at 6.)  Jiggetts denies

offering his resignation and claims he informed Mabray that he would sue for mental health

discrimination if he were not given another training opportunity.  (Compl. at 7.)

On November 26, 2002, Mabray telephoned Jiggetts and requested that he come in to pick up his uniform and begin work at LGA. (Id. ¶ 16.) Jiggetts said Mabray assured him not to worry about his incomplete training and told him that he had passed his background check. (Plaintiff's Affidavit in Opposition to Defendant's Motion ("Pl.'s. Aff. Op. Def. Mot.") at 9.) Mabray said that Jiggetts never told her he had not completed Basic Training. (Defs.' 56.1 St. ¶ 17.)

From late November 2002 until June 2003, Jiggetts, despite never having completed Basic Training, worked at baggage screening areas for U.S. Airways and CTX American Air Lines. (Compl. at 7, 11.) During this time, Jiggetts was not permitted to handle the baggage x-ray machine and was denied on-the-job training, even though, according to Jiggetts, he asked for it from several supervisors, including LGA Training Coordinator Lawrence King ("King"). (Id. at 11.) It is unclear from the submissions of the parties whether the tasks Jiggetts performed during his employment with TSA were that of a Screener.[1]

Jiggetts claims that TSA supervisors harassed him by trying to smell his breath and following him when he went to the restroom. (Id. at 5.) He further claims that his supervisors had Port Authority police officers, ticket agents, and pilots watching him.[2] (Id. at 6-7.) Jiggetts

---

[1] It is also unclear from the facts provided why Jiggetts was denied on-the-job training while working at LGA. TSA supervisors learned about his dismissal from Basic Training seven months after Jiggetts had started screening. Presumably, they would have provided him OJT during those seven months absent that information.

[2] Jiggetts provided only testimonial evidence (as opposed to documentary evidence) of this alleged treatment because, he claims, he was incorrectly told by a supervisor named Gene McNamara that Screeners could not make reports against supervisors. (Comp. at 11.)

also claims that he and a Screener named Luis Rosales were subject to a public reprimand for returning to their posts late, and were verbally attacked in the process.  (Id. at 19.)

### C.    Jiggetts' Termination

In June 2003, LGA Training Coordinator Lawrence King ("King") conducted a routine audit of TSA training records and learned that Jiggetts had been dismissed from Basic Training for "non-academic reasons."  (Defs.' 56.1 St. ¶ 19.)  King subsequently conveyed this information to Mabray orally and to the Federal Security Director in a memorandum.  (Defs.' 56.1 St. ¶¶ 18, 20.)  Mabray is not aware of any Screener who worked at LGA without having completed Basic Training.  (Id. ¶ 17.)  Neither is King.  (Id. ¶ 21.)

On June 30, 2003, Assistant Federal Security Director John T. Ellison ("Ellison") issued Jiggetts a "Memorandum of Termination for Failing to Successfully Complete Required Training," notifying Jiggetts that he was being placed on administrative leave pending termination.  (Id. ¶ 22.)  Jiggetts was given a "Termination During Probationary Period" letter on July 18, 2003.  (Id. ¶ 23.)  Pursuant to HRM Letter 300-2, Interim Policy on Probationary Periods, an employee may be terminated any time during an initial period of training or orientation or at any time during the probationary period.  (Id. ¶ 27.)

Jiggetts testified at his deposition that on June 13, 2003, a month before he was placed on administrative leave, he had a conversation with Ellison about his seeking EEO relief.  (Jiggetts' Dep. Tr. at 149-54.)  Ellison, however, claims that when he placed Jiggetts on administrative leave and terminated him, he did not know that Jiggetts was seeking EEO relief.  (Defs.' 56.1 St. at Ex. H.)

## III.    PROCEDURAL HISTORY

Jiggetts initiated contact with an EEO counselor at TSA on February 28, 2003, which was followed by an EEO counseling interview on May 9, 2003.  (Letter from TSA EEO Counselor, dated May 21, 2003 ("TSA EEO letter"), annexed to Compl. at 33.)  Jiggetts then submitted an EEO complaint against DHS and TSA to the TSA's Departmental Office of Civil Rights on July 14, 2003.  (Compl. at 34.)  Because TSA failed to issue a final decision on Jiggett's EEO complaint within 180 calendar days from the date his complaint was received, Jiggetts was entitled to initiate, and did initiate, a civil action in this court on September 8, 2004.[3]  (Compl. at 1, 34-35.)

Jiggetts alleges that Defendants terminated him unlawfully on the basis of his race (African-American) and religion (Islam) and in retaliation for his seeking EEO relief.  (Compl. ¶ 4.)  Jiggetts further alleges that Defendants unlawfully discriminated and retaliated against him for his past experience with alcoholism, which he claims is a physical disability.  (Compl. ¶ 4.)  On March 20, 2006, Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56 on the basis that Jiggetts cannot state a *prima facie* case in support of any causes of action.

---

[3]  The United States Equal Employment Opportunity Commission ("EEOC") did not issue Jiggetts a "right to sue" letter, but such a letter is not required if DHS fails to issue a final decision on an EEO complaint within 180 calendar days and a civil court action is subsequently filed in the appropriate U.S. District Court, is was the case here.  (TSA EEO letter, annexed to Compl. at 35.)

## IV. SUMMARY JUDGMENT

Summary judgment is appropriate "against a party who fails to make a [factual] showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the moving party is the defendant, the district court should grant such a motion only if, after viewing the plaintiff's allegations in plaintiff's favor, "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992) (quoting Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). If he meets this burden, the nonmovant must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (quoting Fed. R. Civ. P. 56(e)). "[I]f the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

In employment discrimination cases, district courts must be "especially chary in handing out summary judgment . . . because in such cases the employer's intent is ordinarily at issue." Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996). "Employers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law." Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999) (internal citations omitted). Direct evidence of discrimination is not

necessary, "since an employer who discriminates against its employee is unlikely to leave a well-marked trail." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000). However, as a general rule, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d. Cir. 1985). Even in the employment discrimination context, "when no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo, 22 F.3d at 1224.

## V. DISCUSSION

### A. Race and Religion Discrimination Claim

Title VII states, in pertinent part, that "it shall be an unlawful employment practice for an employer . . . to discharge any individual, or to otherwise discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. §2000e-2(a). A plaintiff asserting a Title VII claim bears the burden of first establishing a *prima facie* case of discrimination. McDonnell Douglas Corp. v. Green, 414 U.S. 792, 802 (1973). To establish a *prima facie* case, the plaintiff must show (1) that he was a member of a protected class, (2) that he was qualified for the position, (3) that he suffered an adverse employment action, and (4) that the circumstances under which the adverse action occurred gave rise to an inference of discrimination. Id.; see also Meiri, 759 F.2d at 995.

Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's [discharge]."

McDonnell Douglas, 414 U.S. at 802. If the defendant advances evidence of a nondiscriminatory basis for its action, the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the nondiscriminatory reasons advanced for the plaintiff's rejection are a pretext for discrimination. McDonnell Douglas, 414 U.S. at 804.

As a Muslim man of African-American descent discharged by his employer, Jiggetts satisfies the "protected class" and "adverse employment action" elements of his Title VII claim. See Meiri, 759 F.2d at 995. Defendants agree, but argue that Jiggetts cannot satisfy the third and fourth elements of a *prima facie* case. (Defs.' Mem. Supp. Summ. J. at 4, 7.)

### 1.    "Qualified for the Position"

Defendants assert that Jiggetts was not qualified to be a Screener because he failed to complete training for the position. (Id. at 7.)  This court agrees. When Jiggetts accepted an appointment with TSA as a Screener on August 29, 2002, he signed a letter that stated his employment was contingent on his successful completion of the required training. (Defs.' 56.1 St. ¶ 7.)  He then started Basic Training, the minimum qualification to be a TSA screener, on September 16, 2002. (Id. ¶¶ 4-5, 9.)  Basic Training is a 45-hour training program conducted over six days. (Id. ¶ 4.)  It is undisputed that Jiggetts left Basic Training after two days and did not report to training class again. (Id. ¶ 13.)  His departure occurred after he exhibited signs of intoxication in class, a violation of the Code of Conduct he signed when he was appointed as a Screener. (Id. ¶ 13.)  Jiggetts' supervisor then gave him the option to either voluntarily resign or return the next day. (Id.)  Jiggetts chose to do neither. (Id. ¶¶ 10, 13.)  As a result, he did not complete Basic Training, a fact that he has acknowledged. (Jiggetts' Dep. Tr. at 75-76.) Jiggetts' allegation that he was not permitted to complete on-the-job training therefore becomes

moot, because admission into OJT depended upon his completion of Basic Training. (Defs.' 56.1 St. ¶ 6.)

The submissions of both parties indicate that Jiggetts worked in some capacity at LGA for several months. (Compl. at 7, 11; Defs.' 56.1 St. ¶¶ 16, 19.) Defendants dispute that Jiggetts was a Screener, but because the court must draw all permissible inferences of the facts in favor of the nonmovant, I will assume that Jiggetts functioned as a Screener for the purpose of this motion. Anderson, 477 U.S. at 255.

Jiggetts may argue that he satisfies the "qualified for the position" element of his *prima facie* case of discrimination because he functioned as a Screener. But Jiggetts was found unqualified for his job as a Screener through a facially neutral employment standard: whether or not he completed Basic Training. As he does not claim that this TSA standard had an "adverse impact on [him] as a member of a protected class," this court will not look to his job performance instead of this standard when evaluating his qualifications. Smith v. Xerox Corp., 196 F.3d 358, 364 (2d Cir. 1999).

### 2. "An Inference of Discrimination"

Defendants further argue that there is no evidence in the record that gives rise to an inference of discrimination against Jiggetts, the fourth element of a *prima facie* employment discrimination claim. See McDonnell Douglas, 411 U.S. at 804. The court agrees. A plaintiff may prove an inference of discrimination by showing that a similarly situated individual not in the plaintiff's protected class was treated more favorably. See Hargrett v. National Westminster Bank, USA, 78 F.3d 836, 839 (2d Cir. 1996). To be similarly situated, "the individuals . . . must be similarly situated in all material respects." Shumway v. United Parcel Serv. Inc., 118 F.3d

60, 64 (2d Cir. 1997). The burden of demonstrating circumstances that would permit a rational trier of fact to infer discrimination is *de minimis*. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 38 (2d Cir. 1994).

Jiggetts has not presented any evidence to suggest that his dismissal from Basic Training or his termination for failure to complete Basic Training arose under circumstances giving rise to an inference of discrimination. He does not name other employees at LGA who were dismissed from Basic Training but were permitted to perform the duties of a Screener at LGA, let alone any dismissed from Basic Training for being intoxicated. Additionally, neither the LGA Training Coordinator nor the LGA Human Resources specialist knows of any other Screeners employed at LGA who were either dismissed from Basic Training or had not completed Basic Training. (Defs.' 56.1 St. ¶ 7.)

Moreover, Jiggetts concedes that he had no reason to believe that he was sent home from Basic Training for any reason other than that his instructors smelled alcohol on his breath. (Id. ¶ 13; Jigetts' Dep. Tr. at 76.) He offers no evidence that his dismissal from Basic Training, his lack of future training opportunities, or his eventual termination were due to racial or religious discrimination. In fact, at his deposition, Jiggetts explained that he alleged racial discrimination merely to "cover his bases." (Jiggetts' Dep. Tr. at 114.) He suggested this claim was reasonable because "all of the instructors [were] white . . . [almost] all of the managers were white [and the] United States is a racist country." (Id.) Although the burden for establishing a *prima facie* case of discrimination is minimal, it cannot be met by such speculation. See Abdu-Brisson, 239 F.3d at 466. A jury could not reasonably conclude, based on Jiggetts' admissions and his conclusory

statements, that he was discriminated against by Defendants because of his race or religion.  He has therefore not satisfied his burden of making out a *prima facie* case of discrimination.

## B. The Disability Claim

Jiggetts has brought an ADA claim of discrimination.  I will deem this to be a claim under the Rehabilitation Act of 1973 ("RA"), as the ADA does not apply to agencies of the United States government.  <u>See</u> 42 U.S.C. §§12111(2), 12111(5)(B)(I).  The RA makes it unlawful to discriminate against an "otherwise qualified individual with a disability."  29 U.S.C. § 794(a).

To establish a *prima facie* case of discriminatory termination in violation of the RA, a plaintiff must show (1) that the plaintiff is handicapped within the meaning of the RA, (2) that the plaintiff is otherwise qualified to perform the job, (3) that the plaintiff was discharged because of his or her handicap, and (4) that the employer is a recipient of federal financial assistance.  <u>Heilweil v. Mount Sinai Hosp.</u>, 32 F.3d 718, 722 (2d Cir. 1994).  If a plaintiff has established a *prima facie* case, the burden shifts to the defendant to provide a legitimate non-discriminatory reason for the discharge.  <u>Id.</u>  The plaintiff retains the ultimate burden of persuasion and must show, using "evidence constituting the *prima facie* case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason," that the defendant's proffered reason was pretextual.  <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129, 134-35 (2d Cir. 2000)  "Summary judgment is appropriate . . . only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact."  <u>Id.</u> at 135.

To demonstrate a disability under the RA, a plaintiff must show (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of having such an impairment; or (3) that he is regarded as having such an impairment.  See 42 U.S.C.  § 3602(h); 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20).

Jiggetts claims his disability under RA is "recovering alcoholic."  Here, a rational trier of fact could conclude that Jiggetts did have the disability of alcoholism and was therefore a member of a protected class under RA.  Alcoholism, like drug addiction, can be an "impairment" under the definitions of a disability set forth in the ADA and RA.  See  Buckley v. Consolidated Edison Co. of New York, Inc., 127 F.3d 270, 273-74 (2d Cir. 1997), *vacated en banc on other grounds*, 155 F.3d 150 (2d Cir. 1998) (recovering drug addict or alcoholic may be considered to have a "disability" under the ADA).  Jiggetts' own testimony that he was treated by a psychiatrist for his addiction, and the record of his treatment at Our Lady of Mercy Medical Center, in the Bronx, together could establish that he suffered from alcoholism.  (Pl.'s. Aff. Op. Def. Mot. ¶ 4, Ex. B.)  Defendants do not argue that Jiggetts cannot satisfy this element, nor do they dispute that TSA receives federal funding.  (Defs.' Mem. Supp. Summ. J. at 13-15.)  They do, however, argue that Jiggetts cannot satisfy the second and third element of the *prima facie* case for an RA violation.

### 1.     "Not Otherwise Qualified"

Defendants argue that Jiggetts was "not otherwise qualified" for the Screener position because he did not complete Basic Training, much less receive OJT.  (Defs.' Mem. Supp. Summ. J., at 15.)  This court agrees.  Jiggetts' original appointment letter, which he signed, stated that his appointment was probationary for one year, pending his successful completion of the

required training.  (Defs.' 56.1 St.  ¶ 7.)  Given that completion of Basic Training was a minimal requirement for the job, and that Jiggetts admits he did not complete Basic Training, a reasonable juror could not conclude that Jiggetts was "otherwise qualified" for the job.  (Defs.' 56.1 St. ¶ 7.)

### 2.    "Discharged Because of His or Her Handicap"

Defendants also argue that because Jiggetts has offered no evidence that he was sent home for being an alcoholic (as opposed to being intoxicated) he fails to establish the necessary causal connection between his disability and his dismissal from Basic Training.  (Defs.' Mem. Supp. Summ. J. at 15.)  Again, the court agrees.  Jiggetts conceded at his deposition that he was sent home from Basic Training only because instructors smelled alcohol on his breath, which was in clear violation of the Code of Conduct he signed, and that he had no basis to believe that he was sent home for any other reason, including his alleged alcoholism.  (Jiggetts' Dep. Tr. at 76.)  He was also given the opportunity to return the next day, but chose not to.  (Defs.' 56.1 St. ¶ 13.)

Jiggetts has therefore not stated, and cannot state, a *prima facie* case of RA discrimination.  He was terminated from his job because he failed to complete the required training.  He did not complete the required training because he was found intoxicated on a particular day of training, and he then declined to return the next day despite being invited back. A reasonable jury could not find that his alleged alcoholism (as opposed to intoxication) caused any adverse employment treatment.

### C.      Hostile Work Environment Claim

Jiggetts claims that he was subject to a hostile work environment based on his alleged alcoholism.  "To determine whether employers have violated the Rehabilitation Act, courts use the standards set forth in the Americans with Disabilities Act.  Courts have routinely used Title VII as a model when interpreting the ADA."  Lucenti v. Potter, 432 F. Supp. 2d 347, 360 (S.D.N.Y. 2006) (citations omitted).  This court will therefore evaluate Jiggetts' claim under the standards of Title VII.

To prevail on a hostile work environment claim under Title VII, a plaintiff must show that "(1) the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)); see also Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 78 (1998) (stating that a hostile work environment is created "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment").

Among the factors to consider when determining whether an environment is unlawfully hostile are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  Alfano, 294 F.3d at 374 (quoting Perry, 115

F.3d at 149). "Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004).

Despite the fact that Jiggetts did not complete Basic Training, Defendants employed him for seven months. (Compl. at 7, 11.) During this time, Jiggetts alleges, TSA supervisors harassed him on the job by trying to smell his breath and following him when he went to the restroom. (Id. at 5.) Jiggetts further contends that his supervisors had Port Authority police officers, ticket agents, and pilots watching him. (Id. ¶¶ 6-7.) Finally, he claims that he was subject, on one occasion, to a public dress-down by his supervisor for taking a long lunch, and was called "stupid." (Id. at 19.)

Defendants argue that Jiggetts failed to offer sufficient evidence of any discriminatory intimidation, much less something sufficiently severe or pervasive to alter the conditions of his work environment. (Defs.' Mem. Supp. Summ. J. at 12-13.) This court agrees. In addition, Jiggetts has not alleged facts "sufficient to allow a fact-finder to conclude that defendants' alleged hostility was based on a prohibited factor." Terry v. Ashcroft, 336 F.3d 128, 150 (2d Cir. 2003). Although Jiggetts was allegedly followed while he worked, he did not establish the necessary "linkage or correlation" between these otherwise neutral incidences and any discriminatory animus. See Alfano, 294 F.3d at 377. The same analysis can be applied to Jiggetts' negative encounter with his supervisor, which appears entirely unrelated to any alleged disability. (Compl. at 19.) A reasonable juror could not find that Jiggetts was subjected to a pattern of severe and pervasive ill treatment that was "permeated with discriminatory

intimidation." Oncale, 523 U.S. at 78 (1998). I must therefore conclude that Jiggetts'

experience does not give rise to a claim of a hostile work environment.

### D. Retaliation Claim

Title VII forbids an employer from discriminating against an employee because he or she

"opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or

participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a). A retaliation

claim is evaluated under the burden-shifting framework established by the Supreme Court in

McDonnell Douglas v. Green, 411 U.S. 792 (1973). See Quinn v. Green Tree Credit Corp., 159

F.3d 759, 764 (2d Cir. 1998). "In the context of a motion for summary judgment, the plaintiff

must first demonstrate a *prima facie* case of retaliation, after which the defendant has the burden

of pointing to evidence that there was a legitimate, non-retaliatory reason for the complained of

action. If the defendant meets its burden, the plaintiff must demonstrate that there is sufficient

potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for

impermissible retaliation." Richardson v. New York State Dept. of Correctional Serv., 180 F.3d

426, 443 (2d Cir. 1999) (citing Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998)).

In order to present a *prima facie* case of retaliation under Title VII, an employee must

cite evidence sufficient to permit a rational trier of fact to find that "(1) [he] engaged in a

protected activity; (2) [his] employer was aware of this activity; (3) the employer took adverse

employment action against [him]; and (4) a causal connection exists between the alleged adverse

action and the protected activity." Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 608

(2d Cir. 2006). Proof of a causal connection can be established "directly through evidence of

retaliatory animus directed against a plaintiff . . . or indirectly by showing that the protected

activity was followed closely by discriminatory treatment." Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 444 (2d Cir. 1999) (quoting DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987)).

Defendants do not dispute that Jiggetts engaged in a protected activity when he filed his discrimination complaint, first with TSA's Departmental Office of Civil Rights, and then with this court. They also do not question that his being dismissed from Basic Training, being placed on administrative leave, and then being terminated are adverse employment actions. Instead, Defendants argue that Jiggetts' senior supervisor, who managed screening functions at LGA, was not aware of Jiggetts' protected activity and that there is no causal connection between that protected activity and any adverse employment action. (Defs.' Mem. Supp. Summ. J., at 15-19.)

### 1. "Employer was Aware of this Activity"

Defendants maintain that Jiggetts has not offered specific or credible evidence that his senior supervisor, Ellison, knew that Jiggetts was seeking EEO relief when Ellison placed Jiggetts on administrative leave and then terminated him. (Defs.' Mem. Supp. Summ. J. at 18-19.) Given that this court must draw all permissible inferences from submitted depositions in favor of the non-moving party, Defendants' argument cannot prevail.

Jiggetts testified at his deposition that he mentioned his effort to receive EEO relief during a conversation he had with Ellison on June 13, 2003. (Jiggetts' Dep. Tr. at 149-54.) Although Ellison claims that he knew nothing about Jiggetts' EEO action, this conflicting testimonial evidence raises a genuine issue of fact that turns on the credibility of the parties. Furthermore, Ellison does not deny that he spoke with Jiggetts on June 13, 2003, lending credibility to Jiggetts' testimony. (Defs.' 56.1 St. ¶¶ 22-23.) Because "[a]ssessments of

credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment," this court is unable to conclude Ellison was unaware of Jiggetts' protected activity at the time Jiggetts was dismissed, the second element to the retaliation claim. Gorman-Bakos v. Cornell Coop. Extension of Schenectady Co., 252 F.3d 545, 553 n.4 (2d Cir. 2001). "Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment." Id.

### 2. "A Causal Connection"

Defendants also argue that Jiggetts cannot show a causal connection between his protected activity and his adverse employment treatment because Jiggetts filed his EEO complaint on July 14, 2003, more than a month after he allegedly had a conversation about it with Ellison. (Id.) This argument fails because Jiggetts testified at his deposition that he had an EEO counseling session in February 2003 and had discussed this session with Ellison on June 13, 2003. (Jiggett's Dep. Tr. at 149.) A reasonable juror might therefore conclude that Ellison knew about the pending EEO action before taking adverse employment action. As this element also involves a weighing of evidence, which ultimately is "the prerogative of the finder of fact, not an exercise for the court on summary judgment," this court finds that Jiggetts has stated a *prima facie* claim of retaliation based on the administrative leave and termination actions against him. Bakos, 252 F.3d at 553 n.4.

### 3. Asserting a Legitimate, Non-Retaliatory Reason

The burden now shifts to Defendants to assert legitimate, non-retaliatory reasons for placing Jiggetts on administrative leave and then terminating him. Defendants have done so, claiming that Jiggetts was dismissed from Basic Training for being intoxicated and was placed

on administrative leave and terminated for failing to complete Basic Training. (Defs.' Mem. Supp. Summ. J., at 19.) The fact that Jiggetts failed to complete Basic Training and the reason given for his failure are supported by a thorough set of contemporaneous documents, and are even conceded by Jiggetts. (Jiggett's Dep. Tr. at 76.)

### 4. Evaluating Legitimate, Non-Retaliatory Reason as Pretext

Jiggetts must therefore offer "sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely operates for impermissible retaliation." Richardson, 180 F.3d at 443. He has not done so. Jiggetts concedes that his failure to complete Basic Training was discovered during a routine audit of training records, that he was terminated shortly after this discovery was made, and that nobody has been permitted to work as a Screener without completing Basic Training. Therefore, even if a reasonable juror were to believe that Jiggetts and Ellison spoke on June 13, 2003 about Jiggetts' intent to file an EEO complaint (Jiggetts' Dep. Tr. at 149-54), the juror would not be able to find that Jiggetts' failure to complete Basic Training was used as a pretext for unlawful termination.

## VI. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED, and Jiggetts' claims are all dismissed with prejudice. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: March 30, 2007            /s/ Nicholas G. Garaufis
      Brooklyn, N.Y.            NICHOLAS G. GARAUFIS
                               United States District Judge